# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **BRIDGETOWN TRUCKING, INC.,**<br>**an Oregon corporation,**<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>**ACATECH SOLUTIONS, INC.,**<br>**a California corporation; and DOES 1-10,**<br><br>　　　　　Defendants. | Case No. 3:16-cv-00236-SI<br><br>**OPINION AND ORDER** |

Howard M. Levine and Clifford S. Davidson, SUSSMAN SHANK LLP, 1000 SW Broadway, Suite 1400, Portland, OR 97205. Of Attorneys for Plaintiff Bridgetown Trucking, Inc.

Kristen L. Tranetzki, ANGELI UNGAR LAW GROUP LLC, 121 SW Morrison Street, Suite 400, Portland, OR 97204, and William F. Small, III, SMALL & SCHENA LLP, 1350 Columbia Street, Suite 700, San Diego, CA 92101. Of Attorneys for Defendant Acatech Solutions, Inc.

**Michael H. Simon, District Judge.**

Plaintiff Bridgetown Trucking, Inc. ("BTI") brings this lawsuit against Defendants

Acatech Solutions, Inc. ("Acatech") and Does 1 through 10 ("Doe Defendants")[1] under the

---

[1] The use of "Doe" or fictiously-named defendants is permissible in federal question cases if the complaint alleges why the defendant's real name was not then known or ascertainable. *See Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388, 390 n. 2 (1971); *Merritt v. Cty. of L.A.*, 875 F.2d 765, 768 (9th Cir. 1989).

Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030. The CFAA, enacted in 1984, prohibits several forms of computer crimes, including accessing a computer without authorization or in excess of authorized access for the purpose of obtaining protected information, engaging in fraudulent behavior, or intentionally causing damage to a computer. 18 U.S.C. § 1030(a); *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1130 (9th Cir. 2009). Violations of the CFAA are punishable as felonies, as are attempts and conspiracies to violate the CFAA. 18 U.S.C. § 1030(b)-(c). The CFAA also authorizes any person suffering damage or loss caused by a violation to bring a civil lawsuit for compensatory damages, injunctive relief, or other equitable relief. *Id.* § 1030(g).

BTI's First Claim, brought only against Acatech, alleges that Acatech violated the CFAA. BTI's Second Claim, brought only against the unidentified Doe Defendants, alleges that the Doe Defendants conspired to violate the CFAA by committing the same acts that BTI alleges against Acatech. Acatech has moved to dismiss both claims, or in the alternative to transfer this lawsuit to California, or in the further alternative to stay this action. For the reasons stated below, the entirety of this dispute is subject to a valid, binding, and enforceable arbitration agreement between BTI and Acatech. Accordingly, under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1, *et. seq.*, the Court grants Acatech's motion to dismiss.

## STANDARDS

The FAA applies to all contracts involving interstate commerce and specifies that "written agreements to arbitrate controversies arising out of an existing contract 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (quoting 9 U.S.C. § 2). When a contract contains an arbitration clause, a presumption of arbitrability exists. *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986);

PAGE 2 – OPINION AND ORDER

*see also Mortensen v. Bresnan Commc'ns, LLC*, 722 F.3d 1151, 1157 (9th Cir. 2013) (stating that the party "challenging the enforceability of an arbitration agreement bear[s] the burden of proving that the provision is unenforceable"). Additionally, where "parties concede that they have agreed to arbitrate ***some*** matters pursuant to an arbitration clause, the 'law's permissive policies in respect to arbitration' counsel that 'any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration.'" *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 298 (2010) (emphasis in original) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 945 (1995)).

The text of the FAA "leaves no place for the exercise of discretion by a district court," but instead "mandates that district courts ***shall*** direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter*, 470 U.S. at 218 (emphasis in original) (citing 9 U.S.C. §§ 3-4). The district court must limit itself "to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). "If the response is affirmative on both counts, then the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms." *Id.*

## BACKGROUND

There are often two sides to a story in a federal civil lawsuit. The Court first describes the dispute from BTI's perspective, followed by the perspective of Acatech. The Court relies upon the allegations in BTI's Complaint, Dkt. 1, as well as the information supplied by the parties in their respective declarations and exhibits filed in connection with the pending motion. *See Xinhua Holdings Ltd. v. Elec. Recyclers Int'l, Inc.*, 2013 WL 6844270, at *5 (E.D. Cal. Dec. 26, 2013) (citing cases and stating that "[f]or purposes of deciding a motion to compel arbitration, the Court may properly consider documents outside of the pleadings"). Because this case is

being dismissed in favor of arbitration, the Court expresses no comment on the merits of the parties' dispute. Accordingly, to the extent relevant to the pending motion, all factual disputes, including any reasonable inferences from the facts, are resolved in favor of BTI.

## A.  The Facts from BTI's Perspective

BTI is an Oregon corporation with its principal place of business in Portland, Oregon. Dkt. 1 ¶ 1. BTI performs trucking and warehouse fulfillment services for many different customers, including product manufacturers. *Id.* ¶ 8. When an end-user (or ultimate customer) places an order with one of BTI's customers, the BTI customer electronically notifies BTI. *Id.* BTI then coordinates the delivery of the ordered item or items to the end-user. *Id.* Acatech is a California corporation with its principal place of business in Orange County, California. Dkt. 7 ¶ 2. Acatech designed and owns software known as the "Warehouse 2000 System" that manages orders and warehouse inventory (the "Software"). *Id.* ¶ 4.

In August of 2014, BTI and Acatech entered into a written contract in which Acatech agreed, among other things, to grant a non-exclusive license to BTI to use the Software and provide necessary and ongoing system support for BTI's operation of the Software (the "Agreement"). Dkt. 1 ¶ 10; Dkt. 7 ¶ 5; *see also* Dkt. 7-1 § 2-02 ("[Acatech] shall provide all necessary system support to BTI and its clients. The repair or replacement of equipment is excluded. . . . [Acatech] shall establish a Trouble-Reporting procedure for [BTI] and its clients."); Dkt. 16 (Agreement, plus "Statement of Work").

The Agreement provides for arbitration between the parties as follows:

> ***Any controversy or claim arising out of or relating to this Agreement or the breach thereof shall be settled by binding arbitration.*** The arbitration shall take place within the State of California in accordance with the commercial arbitration rules of the American Arbitration Association. . . . In addition, no party shall have any right to commence or maintain any suit or legal proceeding concerning a dispute hereunder until the dispute has

> been determined in accordance with the arbitration provisions of
> this Section and then only for enforcement of the award rendered
> in such arbitration.

Dkt. 7-1 § 1-16 (emphasis added). The Agreement additionally states that it "shall be governed by and construed in accordance with the laws of the State of California." *Id.* § 1-15.

On February 1, 2015, the Software was installed on BTI's computer system. Dkt. 1 ¶ 11. Acatech retained remote access to BTI's computer system in order to facilitate support and Software updates. *Id.* ¶ 10. On August 8, 2015, Acatech remotely accessed BTI's computer system in order to update the Software. *Id.* ¶ 12. At midnight on Thursday, October 1, 2015, the Software stopped functioning. *Id.* ¶ 14. When one of BTI's customers attempted to submit an order through the Software, the Software returned an error message and terminated the order. *Id.* BTI informed Acatech that same day about the Software's failure. *Id.* ¶ 15. According to BTI, Acatech refused to provide support for the malfunctioning Software and instead demanded that BTI pay $30,000 as a condition for Acatech repairing the Software. *Id.* ¶ 16. BTI agreed, and on October 2, 2015, wired $10,000 to Acatech. *Id.* ¶ 17. BTI paid Acatech the remaining $20,000 in two subsequent installments. *Id.* On October 4, 2015, Acatech remotely accessed BTI's computer system to repair the Software. *Id.* ¶ 18.

BTI alleges that in November of 2015, BTI discovered that the Software failed on October 1, 2015, because Acatech previously inserted code into the Software that instructed the Software to malfunction on that day. *Id.* ¶¶ 20-23. BTI calls this code a "time bomb." *Id.* ¶ 23. BTI alleges that it later searched its computer system for additional "time bombs" and discovered another that was set to instruct the Software to fail on February 5, 2016. *Id.* ¶¶ 25-26. BTI states that the second "time bomb" was installed on October 4, 2015, the same day that Acatech remotely accessed BTI's computer system to repair the Software. *Id.* ¶ 37. BTI alleges that the discovery of the second "time bomb" required BTI to decline to accept business from a

significant new customer out of fear that BTI would not be able adequately to serve the customer because of the pending Software malfunction. *Id.* ¶¶ 27 -29.

On February 4, 2016, Acatech sent BTI a letter demanding payment of $134,029.38. *Id.* ¶ 35. In that letter, Acatech stated that BTI owed Acatech past due payments under the Agreement. *Id.* ¶ 35. BTI denies that it owed that amount to Acatech. *Id.* The next day, the second "time bomb" "detonated," and the Software again stopped working. *Id.* ¶ 36. By that time, however, BTI already had migrated to other software for its order fulfillment. *Id.*

## B.  The Facts from Acatech's Perspective

According to Acatech, BTI was consistently late in making payments to Acatech under the Agreement and failed to pay some invoices in full. Dkt. 7 ¶ 9. Acatech states that BTI eventually stopped making payments on its invoices after August 2015. *Id.* Acatech asserts that BTI was in material breach of the agreement in October of 2015 and owed Acatech approximately $63,869.36 in unpaid invoices. *Id.* ¶ 10. Because BTI was in material breach for non-payment under the Agreement, Acatech turned off the Software on October 1, 2015. *Id.* ¶ 11. Acatech then offered to restore the Software if BTI made two payments on overdue invoices from June and July 2015, and BTI agreed to bring its account current by December 31, 2015. *Id.*; Dkt. 7-2. BTI did not pay the June and July 2015 invoices in full, but instead negotiated with Acatech on a payment plan for all amounts owed. Dkt. 7 ¶ 11; Dkt. 7-2. Acatech agreed to accept BTI's payment plan, and Acatech then turned back on the Software. Dkt. 7 ¶ 11.

Acatech asserts that after it repaired the Software, BTI again began to fall behind in its payments owed to Acatech. *Id.* ¶ 14. According to Acatech, BTI further breached the Agreement by failing to provide to Acatech documentation of BTI's customer billings. *Id.* According to Acatech, BTI did not bring its account current by December 31, 2015. *Id.* As a result, on January 5, 2016, Acatech informed BTI that it was going to terminate the Agreement on

PAGE 6 – OPINION AND ORDER

February 5, 2016, due to BTI's alleged failure to pay and BTI's breach of contract. *Id.*; Dkt. 7-3. Acatech turned the Software off on February 5, 2016. Dkt. 7 ¶ 18.

BTI filed its Complaint in this case on February 8, 2016. Acatech then demanded that BTI submit the claims asserted in this case to arbitration. Dkt. 8 ¶ 5; Dkt. 8-1. Acatech also demanded that BTI agree to arbitrate Acatech's breach of contract claims against BTI. *Id.* BTI agreed to arbitrate Acatech's claims for breach of contract, but refused to submit to arbitration BTI's claims under the CFAA that are alleged in this lawsuit. Dkt. 8 ¶ 6; Dkt. 8-2.

## DISCUSSION

The parties do not dispute that a valid agreement to arbitrate exists. Thus, the question before the Court is "whether the [arbitration] agreement encompasses the [specific] dispute at issue." *See Chiron Corp.*, 207 F.3d at 1130. The Ninth Circuit instructs that when interpreting an arbitration agreement, a district court "should look to 'general state-law principles of contract interpretation, while giving due regard to the federal policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration.'" *Boardman v. Pac. Seafood Grp.*, --- F.3d ---, 2016 WL 1743350, at *3 (9th Cir. May 3, 2016) (quoting *Wagner v. Stratton Oakmont, Inc.*, 83 F.3d 1046, 1049 (9th Cir. 1996)). The Agreement contains a choice of law provision designating California law. Dkt. 7-1 § 1-15. Thus, the Court refers to California's law of contract interpretation when needed or applicable.

Acatech contends that the arbitration clause in the Agreement encompasses both claims alleged by BTI. BTI disagrees and argues that its claims are not subject to arbitration for three reasons: (1) a judicial forum for CFAA claims cannot be waived because the CFAA's civil cause of action remedy was enacted for law enforcement and deterrent purposes, thereby making the arbitration clause unenforceable against BTI's claims; (2) arbitration of BTI's CFAA claims would frustrate BTI's reasonable expectations under the Agreement; and (3) BTI's claims cannot

be arbitrated because BTI alleges a conspiracy under 18 U.S.C. § 1030(b) against the Doe

Defendants, who are not signatories to the Agreement.

**A. Whether an Arbitration Clause Is Enforceable Against Civil CFAA Claims**

BTI argues that California law prohibits the waiver of a judicial forum for civil claims

brought under the CFAA. BTI relies upon the California Supreme Court's decision in *Iskanian v.*

*CLS Transportation Los Angeles, LLC*, 59 Cal. 4th 348 (2014), in support of its argument. In

*Iskanian*, the California Supreme Court held:

> The unwaivability of certain statutory rights "derives from two
> statutes that are themselves derived from public policy. First,
> [California] Civil Code section 1668 states: 'All contracts which
> have for their object, directly or indirectly, to exempt anyone from
> responsibility for his own fraud, or willful injury to the person or
> property of another, or violation of law, whether willful or
> negligent, are against the policy of the law.' 'Agreements whose
> object, directly or indirectly, is to exempt [their] parties from
> violation of the law are against public policy and may not be
> enforced.' (*In re Marriage of Fell* (1997) 55 Cal. App. 4th 1058,
> 1065 [64 Cal. Rptr. 2d 5221].) Second, [California] Civil Code
> section 3513 states, 'Anyone may waive the advantage of a law
> intended solely for his benefit. But a law established for a public
> reason cannot be contravened by a private agreement.'"
> (*Armendariz v. Foundation Health Psychcare Services, Inc.*,
> (2000) 24 Cal.4th 83, 100, 99 Cal. Rptr. 2d 745, 6 P.3d 669
> (*Armendariz*).)

59 Cal. 4th at 382-83. BTI argues that the first of these statutes, Cal. Civ. Code § 1668

("§ 1668"), precludes enforcement of the arbitration clause in this case because, according to

BTI, the CFAA's provision for civil suits and compensatory damages was enacted primarily for

law enforcement and deterrent purposes.

In *Iskanian*, the California Supreme Court considered, among other things, whether an

arbitration agreement that required the waiver of representative actions brought under the Private

Attorneys General Act ("PAGA"), Cal. Lab. Code § 2968 *et seq.*, was prohibited under § 1668.

59 Cal. 4th at 382. Under PAGA, "an aggrieved employee may bring a civil action personally

and on behalf of other current or former employees to recover civil penalties for Labor Code

violations." *Id.* at 380 (citation and quotation marks omitted). Seventy-five percent of the civil

penalties recovered in a PAGA representative action go to the Labor and Workforce

Development Agency, with the employees receiving the remaining twenty-five percent. *Id.*

The court in *Iskanian* explained the purpose behind the PAGA:

> [T]he Legislature's purpose in enacting the PAGA was to augment
> the limited enforcement capability of the Labor and Workforce
> Development Agency by empowering employees to enforce the
> Labor Code as representatives of the Agency. Thus, an agreement
> by employees to waive their right to bring a PAGA action serves to
> disable one of the primary mechanisms for enforcing the Labor
> Code.

*Id.* at 383. Accordingly, the court held that an agreement to arbitrate a PAGA representative

action was against public policy and could not be enforced based on § 1668. *Id.* The court further

held that the prohibition on the waiver of PAGA claims was not inconsistent with the FAA

because "the FAA aims to ensure an efficient forum for the resolution of ***private*** disputes,

whereas a PAGA [representative] action is a dispute between an employer and the state Labor

and Workforce Development Agency." *Id.* at 384 (emphasis in original); *see also Sakkab v.

Luxottica Retail N. Am.*, 803 F.3d 425, 427 (9th Cir. 2015) (holding that the FAA does not

preempt the "*Iskanian* rule" in a PAGA representative action).

BTI argues that § 1668 similarly precludes waiver of civil claims brought under the

CFAA because the legislative history of the CFAA reveals that the civil cause of action was

enacted for law enforcement and deterrent purposes. BTI points to the Senate Judiciary

Committee Report from 1990, the year that the civil cause of action was added, which states that

the "remedy would authorize private suits in an area that law enforcement has sometimes been

reluctant to investigate or prosecute" and that "[d]eterrence is another goal." S. Rep. No. 101-544

(1990). A Senator further explained that "[g]iven the Government's limited capacity to pursue all

computer crime cases, the existence of this limited civil remedy will serve to enhance deterrence in this critical area." 101 Cong. Rec. S18235 (1990) (statement of Sen. Humphrey); *see also* 106 Cong. Rec. S10916 (2000) (statement of Sen. Leahy) (stating that Congress provided the civil remedy "to enhance privacy protection for computer communications and the information stored on computers by encouraging institutions to improve computer security practices, deterring unauthorized persons from trespassing on computer systems of others, and supplementing the resources of law enforcement in combating computer crimes").

The Court finds BTI's argument unavailing. Civil claims under the CFAA are distinguishable from PAGA representative actions. Whereas the CFAA allows a plaintiff to seek compensatory damages (as well as equitable relief), the PAGA allows a plaintiff to seek civil *penalties*, the majority of which are retained not by the individual plaintiff, but by the California Labor and Workforce Development Agency. Additionally, although the CFAA civil cause of action may have been added, in part, to supplement deterrence of computer fraud crimes, it is not clear from the statute's legislative history that the provision "was designed primarily as a law enforcement tool," as BTI argues. Dkt. 14 at 16. In contrast, the *Iskanian* court characterized PAGA representative actions as "one of the primary mechanisms for enforcing the [California] Labor Code." 59 Cal. 4th at 383. The *Iskanian* court further explained that a PAGA representative action "functions as a substitute for an action brought by the government itself" and is thus "a type of *qui tam* action."[2] *Id.* at 381-82 (citation and quotation marks omitted). It was because of the *qui tam* nature of PAGA representative actions that the *Iskanian* court held that agreements to arbitrate PAGA representative claims have as their "object, . . . indirectly, to

---

[2] A "*qui tam* action" is defined as: "An action brought under a statute that allows a private person to sue for a penalty, part of which the government or some specified public institution will receive." Black's Law Dictionary (10th ed. 2014).

exempt [the employer] from responsibility for [its] own . . . violation of law," and thus that § 1668 precludes the arbitration of such claims. *Id.* at 383 (alteration in original) (quotation marks omitted).

BTI makes the additional, related argument that Congress intended to prohibit the waiver of a judicial forum for CFAA claims, thereby making unenforceable agreements to arbitrate such claims. The FAA's mandate that courts enforce "agreements to arbitrate statutory claims," such as claims brought under the CFAA's civil cause of action, "may be overridden by a contrary congressional command." *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987). Congressional intent to override the FAA may be apparent from a statute's text, legislative history, or "an inherent conflict between arbitration and the statute's underlying purposes." *Id.* at 227. As the party seeking to avoid arbitration, however, BTI "bears the burden of establishing that Congress intended to preclude arbitration of the statutory claims at issue." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 92 (2000).

BTI provides no case authority from any jurisdiction holding that Congress intended to preclude arbitration of civil claims brought under the CFAA, nor has the Court been able to locate any such authority. To the contrary, district courts routinely enforce arbitration agreements against CFAA claims when there is a general agreement to arbitrate disputes. *See, e.g.*, *Ferguson Enters., Inc. v. Hollenkamp*, 2015 WL 6126844 (W.D. Ky. Oct. 16, 2015); *Thomas Christopher Grp., Inc. v. Moreno*, 2015 WL 4093353 (M.D. Fla. July 6, 2015); *Torbit, Inc. v. Datanyze, Inc.*, 2013 WL 572613 (N.D. Cal. Feb. 13, 2013); *FusionStorm, Inc. v. Presidio Networked Sols., Inc.*, 871 F. Supp. 2d 1345 (M.D. Fla. 2012); *Law Offices of Bradley J. Hofland, P.C. v. McFarling*, 2007 WL 1074096 (D. Nev. Apr. 9, 2007). Indeed, in *Ferguson Enterprise, Inc. v. Hollenkamp*, the district court explicitly found that "nothing suggests that Congress intended [CFAA] claims

to be nonarbitrable." 2015 WL 6126844, at *3. In addition, nothing in the legislative history of

the CFAA discusses whether Congress intended to preclude arbitration. Such silence is

instructive. *See Shearson*, 482 U.S. at 238-39 (finding that because the legislative history of the

Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*, was

silent regarding arbitration, it did not reveal Congressional intent to override the FAA).

Instead, BTI argues that enforcing its arbitration agreement against its claims under the

CFAA would conflict with the "deterrence" purposes of the CFAA's civil cause of action. *See* S.

Rep. No. 101-544 (1990) (describing deterrence as a goal of 18 U.S.C. § 1030(g)); 101 Cong.

Rec. S18235 (1990) (stating that the "civil remedy will serve to enhance deterrence" of computer

crime); 106 Cong. Rec. S10916 (2000) (same). In *Shearson/American Express, Inc. v.*

*McMahon*, however, the Supreme Court considered, in part, whether an "irreconcilable conflict"

exists between arbitration and a civil RICO claim for treble damages such that the Court should

find that Congress implicitly intended to preclude compelled arbitration of a RICO civil claim.[3]

482 U.S. at 239-242. The Supreme Court in *Shearson* rejected the plaintiffs' argument that any

overlap between the civil and criminal provisions of RICO rendered civil RICO claims

nonarbitrable. *Id.* at 239-40. The *Shearson* Court relied, in part, on its previous decision in

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985), in which the

Court "recognized that treble-damages suits for claims arising under § 1 of the Sherman Act may

be subject to arbitration, even though such conduct may also give rise to claims of criminal

liability." *Shearson*, 482 U.S. at 240 (citing *Mitsubishi Motors*, 473 U.S. at 633-34); *see also id.*

---

[3] RICO provides for civil actions and the recovery of treble damages as follows: "Any person injured in his business or property by reason of a violation of [RICO's criminal provisions] may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . ." 18 U.S.C. § 1964.

at 239-40 ("'[T]he fact that conduct can result in both criminal liability and treble damages does not mean that there is not a bona fide civil action.'") (alteration in original) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 492 (1985)).

The Supreme Court in *Shearson* also rejected the plaintiffs' argument that public interest in the enforcement of RICO's criminal provisions precluded arbitration. *Id.* at 240-42. The Court again relied upon *Mitsubishi*, concluding that although § 4 of the Clayton Act had an "'important incidental policing function,'" the legislative intent prioritized the statute's compensatory function. *Id.* at 240 (quoting *Mitsubishi*, 473 U.S. at 635). In *Shearson*, the Court similarly found that the legislative history of RICO's civil provision "reveals the same emphasis on the remedial role of the treble-damages provision" and that the provision's policing function, "although important, was a secondary concern." *Id.* at 240-41. Thus, the Court held that no inherent conflict between arbitration and civil RICO claims existed. *Id.* at 242.

BTI argues that *Shearson* is distinguishable from this case because "the ***primary*** purpose of the CFAA's civil enforcement provision is to complement law enforcement and promote deterrence of cyber-crime." Dkt. 14 at 20 (emphasis in original). Although the Court agrees that the legislative history of the CFAA's civil cause of action discusses the provision's deterrence purposes, the legislative history does not clearly show that the ***primary*** function of the provision is one of policing, as BTI asserts. *See* S. Rep. No. 101-544 (1990) (stating that Senate Bill 2476 "creates a new, civil remedy for those harmed by violations of the Computer Fraud and Abuse Act. This would boost the deterrence of the statute by allowing aggrieved individuals to obtain relief."). Indeed, the Court notes that civil damages available under the CFAA are not trebled, whereas civil damages recoverable under both RICO and the federal antitrust laws are automatically trebled. In light of the Supreme Court's precedent establishing that Congress did

PAGE 13 – OPINION AND ORDER

not intend implicitly to preclude enforcement of arbitration agreements when applied to civil

RICO or antitrust claims, the Court does not find any such implicit Congressional intention in the

context of civil CFAA suits. Thus, the Court finds that BTI has not carried its burden of showing

"an inherent conflict between arbitration and the statute's underlying purposes." *Shearson*,

482 U.S. at 227; *see also Ferguson*, 2015 WL 6126844, at *3 (stating that "nothing suggests that

Congress intended [CFAA] claims to be nonarbitrable" and concluding that the plaintiff's CFAA

claim was arbitrable).

## B.  Whether Arbitration Would Frustrate BTI's Reasonable Expectations

BTI also argues that compelling arbitration would defeat its reasonable expectations

under the Agreement because BTI did not agree to arbitrate Acatech's allegedly "criminal"

behavior under the CFAA. *See Fergus v. Songer*, 150 Cal. App. 4th 552, 574 (2007) ("'The

purpose of the law of contracts is to protect the reasonable expectations of the parties.'")

(quoting *Ben-Zvi v. Edmar Co.*, 40 Cal. App. 4th 468, 475 (1995)). Again, BTI cites to § 1668,

which provides that: "All contracts which have for their object, directly or indirectly, to exempt

anyone from responsibility for his own . . . violation of law, whether willful or negligent, are

against the policy of the law."

BTI offers the Court the following analogy: "Had Ms. Nguyen [Acatech's Vice President

of Sales and Marketing] physically forced Bridgetown's President to make the payment under

the Contract, the fact that the alleged underlying debt arose from a contract would not require

Mr. Chalmers [BTI's President] to arbitrate his claim for personal injury or emotional distress."

Dkt. 14 at 15. BTI, however, offers no case authority supporting the conclusion that it urges from

this analogy, and the correct result is not obvious. Requiring BTI (or its president) to arbitrate a

claim against Acatech (or its vice president) for personal injury or emotional distress, assuming

an arbitration agreement between the plaintiff and the defendant, rather than allowing the

PAGE 14 – OPINION AND ORDER

plaintiff to litigate such a claim in court, does not "exempt" the defendant from "responsibility" under BTI's hypothetical set of facts. An arbitrator has the legal authority to hold a defendant responsible, and no one questions the Agreement's provision that an arbitral award will be fully enforceable in court. *See* Dkt. 7-1 § 1-16 ("In addition, no party shall have any right to commence or maintain any suit or legal proceeding concerning a dispute hereunder ***until*** the dispute has been determined in accordance with the arbitration provisions of this Section ***and then only for enforcement of the award*** rendered in such arbitration.") (emphasis added).

Further, as discussed above, unlike representative claims brought under the PAGA, claims brought under the civil provision of the CFAA are not *qui tam*-type actions in which the plaintiff steps into the shoes of the government. Rather, civil claims brought under the CFAA are private actions for compensatory damages. Thus, the Court finds § 1668 is inapplicable in the context of considering whether arbitration of BTI's CFAA claims was within the parties' reasonable expectations.

The scope of the arbitration clause in the Agreement is very broad. The Agreement provides that: "Any controversy or claim ***arising out of or relating to*** this Agreement or the breach thereof shall be settled by binding arbitration." Dkt. 7-1 § 1-16 (emphasis added); *see also Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 398 (1967) (stating that "the parties agreed to a broad arbitration clause" where the clause containing the phrase "arising out of or relating to"); *Larkin v. Williams, Woolley, Cogswell, Nakazawa & Russell*, 76 Cal. App. 4th 227, 230 (1999) (describing an arbitration clause extending to "[a]ny controversy or claim arising out of or relating to any provision of this [partnership] [a]greement or the breach thereof" as "very broad") (alterations in original) (quotation marks omitted).

In *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716 (9th Cir. 1999), the Ninth Circuit considered how broadly to construe an arbitration clause that contained the phrase "arising in connection with this Agreement." *Id.* at 718. The court concluded "that the language 'arising in connection with' reaches every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract." *Id.* at 721. Thus, a plaintiff's factual allegations "need only 'touch matters' covered by the contract containing the arbitration clause" to require arbitration. *Id.* (quoting *Mitsubishi Motors*, 473 U.S. at 624 n.13). The Ninth Circuit held that the plaintiff's antitrust, Lanham Act, defamation, and trade secret misappropriation claims all were arbitrable. *Id.* at 721-25.

Further, in *Torbit, Inc. v. Datanyze, Inc.*, the court applied the *Simula* test in deciding whether a plaintiff's CFAA claims were arbitrable under a clause similar to the one at issue in this case. 2013 WL 572613, at *3. In that case, the defendant signed an employment agreement with the plaintiff that included an arbitration clause that provided in part that: "In the event of any dispute or claim ***relating to or arising out of*** our employment relationship, you and the Company agree that (i) any and all disputes between you and the Company shall be fully and finally resolved by binding arbitration  . . . ." *Id.* at *1 (emphasis added). The employer alleged that the employee used the employer's computer network to download trade secrets and proprietary information on to his personal computer during the course of his employment. *Id.* at *2. The court held that the because the employment agreement discussed the copying of the employer's information to the employee's personal computer and the proper usage of the employer's information, the allegation regarding unauthorized computer activity and improper use of proprietary information "touches matters that relat[e] to or aris[e] out of" the agreement. *Id.* at *3 (alterations in original) (quotation marks omitted).

BTI argues that *Torbit* is factually distinguishable from this case because unlike *Torbit*, the Agreement at issue here does not explicitly prohibit the conduct that BTI alleges against Acatech. Acatech responds, however, that BTI's claims arise out of and relate to the Agreement that licensed the Software to BTI because BTI's allegations concern BTI's use and Acatech's administration of the Software. The Court agrees. Indeed, the proper resolution of this case ***may*** turn on the interpretation of the Agreement and general principles of California contract law to decide whether, assuming BTI's facts are correct, Acatech was authorized (implicitly or explicitly) to engage in the form of "self-help" that BTI alleges when Acatech was facing a customer whom Acatech contends was in prior material breach based on non-payment.

BTI alleges that Acatech used its remote access to BTI's computer system to "sabotage" BTI's use of the Software. BTI alleges that the Software "stopped accepting orders" and that "[r]ather than provide prompt support upon being informed that the Software had failed, Acatech demanded that [BTI] pay $30,000." Dkt. 1 ¶¶ 14, 16. The Agreement provided that Acatech "shall provide all necessary system support to BTI and its clients." Dkt. 7-1 § 2-02. BTI additionally alleges that the day before the second "time bomb" caused the Software to stop working, Acatech "sent [BTI] a letter demanding payment of $134,029.38. Acatech contends that [BTI] owes that amount pursuant to [the Agreement], which [BTI] denies." Dkt. 1 ¶ 35. Thus, BTI's allegations unquestionably "touch matters" covered by the Agreement. *See Simula*, 175 F.3d at 721 (quotation marks omitted).

Acatech and BTI entered into an agreement containing a "very broad" arbitration clause that encompasses all claims "arising out of or relating to" the Agreement. *See Larkin*, 76 Cal. App. 4th at 230; Dkt. 7-1 § 1-16. Mindful of the strong federal policy favoring arbitration and the Ninth Circuit's guidance that any ambiguities should be resolved in favor of arbitration, the

Court finds that arbitration of BTI's CFAA claims is within the reasonable expectations of the parties and that the claims are subject to the arbitration clause contained in the Agreement. *Cf. Bruni v. Didion*, 160 Cal. App. 4th 1272, 1294-95 (2008) (finding that arbitration provisions in an adhesion contract violated the plaintiffs' reasonable expectations where the provisions were "unforeseeably broad" and "well beyond a layperson's reasonable expectations").

## C. Whether BTI's Conspiracy Claim Precludes Arbitration

BTI further argues that its CFAA claims cannot be subject to arbitration because BTI alleges a conspiracy under 18 U.S.C. § 1030(b). BTI asserts that the Court cannot compel BTI to arbitrate CFAA claims against alleged conspirators who are not parties to the Agreement. Although BTI appears to argue that its conspiracy allegation would preclude arbitration of both of its CFAA claims, including its claim against only Acatech, BTI does not provide any argument or authority for why the alleged inapplicability of the arbitration provision to the Doe Defendants also would preclude arbitration of its claim against Acatech. Thus, the Court considers BTI argument only with regard to BTI's claim against the Doe Defendants, alleging a conspiracy under 18 U.S.C. § 1030(b).

Generally, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs.*, 475 U.S. at 648 (quotation marks omitted). The Ninth Circuit explains, however, "that 'nonsignatories of arbitration agreements may be bound by the agreement under ordinary contract and agency principles.'" *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006) (quoting *Letizia v. Prudential Bache Secs., Inc.*, 802 F.2d 1185, 1187-88 (9th Cir. 1986)). These principles include: (1) incorporation by reference; (2) assumption; (3) ***agency***; (4) veil-piercing or alter ego; and (5) estoppel. *Id.*

PAGE 18 – OPINION AND ORDER

California law is similar. "A party cannot be compelled to arbitrate a dispute that it has

not elected to submit to arbitration." *Crowley Mar. Corp. v. Boston Old Colony Ins. Co.*,

158 Cal. App. 4th 1061, 1069 (2008) (citation and quotation marks omitted). A nonsignatory to

an agreement, however, can be compelled to arbitrate in two situations:

> (1) [W]here the nonsignatory is a third party beneficiary of the
> contract containing the arbitration agreement and [(]2) where "a
> preexisting relationship existed between the nonsignatory and one
> of the parties to the arbitration agreement, making it equitable to
> compel the nonsignatory to also be bound to arbitrate his or her
> claim."

*Id.* at 1069-70 (quoting *Contra Costa v. Kaiser Found. Health Plan, Inc.*, 47 Cal. App. 4th 237,

242 (1996)). "Examples of the preexisting relationship include agency, spousal relationship,

parent-child relationship and the relationship of a general partner to a limited partnership." *Id.*

at 1070.

BTI cites *Moss v. McLucas*, 2013 WL 1680483 (S.D. Cal. Apr. 16, 2013), for the

proposition that the Court cannot compel BTI to arbitrate claims against non-signatory, alleged

conspirators. In *Moss*, the court held, in part, that a defendant whom the plaintiff alleges formed

a conspiracy with other defendants could not compel arbitration when that defendant did not sign

the relevant agreement containing the arbitration clause. *Id.* at *4. The court reasoned as follows:

> "[W]hen a plaintiff alleges a defendant acted as an agent of a party
> to an arbitration agreement, the defendant may enforce the
> agreement even though defendant is not a party thereto." *Thomas
> v. Westlake*, 204 Cal. App. 4th 605, 614, 139 Cal. Rptr. 3d 114 (4th
> Dist. 2012). Plaintiff, however, does not allege that [Defendant] is
> an agent of McLucas, [a non-signatory beneficiary of the
> arbitration agreement]. Rather, Plaintiff alleges that [Defendant]
> and McLucas "formed a conspiracy." Defendant has not cited any
> authority holding that a third party may compel arbitration when it
> has been alleged to be a co-conspirator with a signatory to an
> agreement to arbitrate.

*Id.* In contrast, the court held that a non-signatory defendant alleged to be an employee of the signatory defendant could compel arbitration against the plaintiff. *Id.* at *4 ("An employee may compel arbitration based on an arbitration agreement entered into by his employer.") (citing *Harris v. Superior Court*, 188 Cal. App. 3d 475, 478 (1986)).

BTI's comparison to *Moss* is unavailing because BTI alleges that the Doe Defendants acted as agents of Acatech. BTI identifies the Doe Defendants as "Acatech employees, independent contractors, representatives, directors, officers, agents, or other affiliates" of Acatech. Dkt. 1 ¶ 3. In BTI's description of its conspiracy claim, BTI alleges that the Doe Defendants conspired to commit the acts described in BTI's Complaint, including inserting the "time bombs" into the Software. *Id.* ¶ 49. The Court notes that elsewhere in BTI's Complaint, BTI attributes these acts to Acatech. *See, e.g.*, BTI's First Claim, asserted only against Acatech. Further, BTI does not allege that the Doe Defendants acted, at any time, outside the scope of Acatech's authority. The California Court of Appeals has held that unknown Doe defendants alleged to be the agents and employees of named defendants who were either parties to the contract or who had waived any objection to arbitration "presumably would be subject to the [arbitration] agreement." *Izzi v. Mesquite Country Club*, 186 Cal. App. 3d 1309, 1319 (1986).

BTI provides no persuasive argument for why the result should be different in this case. The Court finds the existence of an alleged agency relationship between Acatech and the Doe Defendants sufficient to require BTI to arbitrate its claim against the Doe Defendants and sufficient to require the Doe Defendants to be bound by the arbitration agreement. *See Crowley*, 158 Cal. App. 4th at 1070; *see also Dryer v. L.A. Rams*, 40 Cal. 3d 406, 418 (1985) (en banc)

(holding that the complaint's allegation of an agency relationship between a corporation and

individual defendants was sufficient for the court to refer the entire dispute to arbitration).[4]

## D.  Stay Versus Dismissal

Although the FAA authorizes a court to stay an action that is subject to a valid agreement

to arbitrate, 9 U.S.C. § 3,[5] a court instead may dismiss an action, rather than merely staying it,

when all of the issues raised in the action are arbitrable. *Sparling v. Hoffman Constr. Co.*,

864 F.2d 635, 638 (9th Cir. 1988) ("The district court acted within its discretion when it

dismissed [the plaintiff's] claims. As in *Martin Marietta* [*Aluminum, Inc. v. General Electric*

---

[4] Acatech also argues that BTI's conspiracy claim against the Doe Defendants is subject to the arbitration clause under a theory of equitable estoppel. In *Murphy v. DirecTV, Inc.*, 724 F.3d 1218 (9th Cir. 2013), the Ninth Circuit described California law regarding equitable estoppel and agreements to arbitrate as follows:

> Where a nonsignatory seeks to enforce an arbitration clause, the doctrine of equitable estoppel applies in two circumstances: (1) when a signatory must rely on the terms of the written agreement in asserting its claims against the nonsignatory or the claims are intimately founded in and intertwined with the underlying contract, and (2) when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and the allegations of interdependent misconduct are founded in or intimately connected with the obligations of the underlying agreement.

*Id.* at 1229 (quoting *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128-29 (9th Cir. 2013)). The Court notes that here, it is not the "nonsignatory seek[ing] for enforce an arbitration clause," but a signatory—Acatech—seeking to enforce the clause on behalf of the Doe Defendants. Because the Court finds that it is otherwise equitable to require BTI to arbitrate against the Doe Defendants and to compel the Doe Defendants to submit to arbitration, the Court does not reach Acatech's additional argument regarding equitable estoppel.

[5] Section 3 of the FAA provides: "If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration."

*Co.*, 586 F.2d 143 (9th Cir. 1978)], the arbitration clause was broad enough to bar all of the plaintiff's claims since it required [the plaintiff] to submit all claims to arbitration."). Because both of BTI's claims are subject to arbitration, the Court finds that dismissal of this case is appropriate.[6]

**CONCLUSION**

The Court GRANTS Defendant Acatech Solution, Inc.'s Motion to Dismiss, or in the Alternative Transfer, or in the Alternative Stay (Dkt. 6) under Section 3 of the Federal Arbitration Act, 9 U.S.C. § 3. This case is dismissed in favor of arbitration.

**IT IS SO ORDERED**.

DATED this 16th day of June, 2016.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge

---

[6] Because the Court is dismissing this case in favor of arbitration, the Court declines to address Acatech's alternative motions to dismiss for lack of personal jurisdiction or to transfer to another venue.